STANDARD TOBACCO STEMMER CO. v. TOBACCO STEMMING MACH. CO.

(District Court, D. Delaware. November 25, 1916.)

No. 323.

1. PATENTS ☞283(1)—SUIT FOR INFRINGEMENT—EFFECT OF NONUSE OF INVENTION.

If a patent is valid, it will continue in full force during the term for which it was granted, although put to no practical use by the patentee, or any one claiming under him; but, when its validity is in question, the continued nonuse by the patentee of the invention, without explanation satisfactorily accounting for it, naturally suggests a question as to the effect of the patent.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 448–450, 452; Dec. Dig. ☞283(1).]

2. PATENTS ☞283(1)—SUIT FOR INFRINGEMENT—ISSUES AND PROOF.

It is a general rule that an infringer will not be heard to deny the utility of that which he has wrongfully appropriated for the purpose of benefiting himself; but the fact of infringement must be proved.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 448–450, 452; Dec. Dig. ☞283(1).]

3. PATENTS ☞234—INFRINGEMENT—CONSTRUCTION OF CLAIMS.

It does not necessarily follow, from the fact that an alleged infringing device comes literally within the terms of a patent claim, that there is infringement; but the claim must be read in the light of the disclosure of the invention as contained in the descriptive portion of the patent.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 370, 381; Dec. Dig. ☞234.]

4. PATENTS ☞328—INFRINGEMENT—TOBACCO-STEMMING MACHINES.

The Guerrant patent, No. 630,344, the Underwood patent, No. 661,199, the Hutcheson patent, No. 713,886, the Frankenburg patent, No. 715,651, and the Havens patent, No. 764,845, all relating to machines for stemming tobacco, and all for improvements on machines of the prior art, construed, and *held* not infringed.

In Equity. Suit by the Standard Tobacco Stemmer Company against the Tobacco Stemming Machine Company. On final hearing. Decree for defendant.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Robert Fletcher Rogers, of New York City, for complainant.

William F. Hall, of Washington, D. C., J. Granville Meyers, of New York City, and Charles Warner Smith, of Wilmington, Del., for defendant.

BRADFORD, District Judge.   The plaintiff, Standard Tobacco Stemmer Company, a corporation of the State of Virginia, charges the defendant, The Tobacco Stemming Machine Company, a corporation of the State of Delaware, with infringement of a number of United States patents, now owned by the plaintiff, all relating to the stemming of tobacco, and including, among others, No. 630,344, of August 8, 1899, to G. M. Guerrant, No. 661,199, of November 6, 1900, to J. B. Underwood, No. 713,886, of November 18, 1902, to J. A. Hutcheson, No. 715,651, of December 9, 1902, to F. G. Frankenburg, and No. 764,-845, of July 12, 1904, to J. G. Havens.  The charge of infringement is not pressed as to any patent not included among those above mentioned.

In the practice of the art of stemming tobacco leaves for the purpose of making cigar wrappers it is highly important that the blade or broad expanded part of the leaf should be separated from the stem with as little mutilation or laceration of the former as possible.  As the breaking or tearing of the blade increases, the quantity of pulverized tobacco or "shorts" increases and is a distinct element of loss to be avoided as far as practicable.  It was stated by counsel for the plaintiff without denial that roughly speaking the amount of shorts in any given brand of tobacco should not exceed about five per cent.  The stem of the tobacco leaf is brittle and the membrane is easily broken; and it has been the aim of those engaged in the art to provide such mechanical appliances as will secure the stemming of the leaf with the production of only the minimum quantity of shorts.  It has also been their aim to secure an effectual gripping of the stems of the tobacco leaves in order that they may be conveyed through the stripping machine and not dropped or permitted to fall by the way, and thereby clog the machine or necessitate their reintroduction into it.  It is further important, owing to the brittleness, fragility, and other characteristics of the tobacco leaf, and possibly for other reasons, that it should not be unnecessarily bent or distorted while passing through and being subjected to the process of stemming in the machine, and hence that the tobacco leaves should as far as practicable pursue an approximately rectilinear course through the machine without marked or sudden deflection either in a lateral or a vertical plane until a point be reached beyond which such deflection will have no detrimental effect upon the stemming.

There are certain mechanical devices performing useful functions common to tobacco stemming machines of the general class to which the patents in suit relate.  In order that the leaves may be subjected to the process of stripping it is necessary that they should be automatically drawn or conveyed through the machine.  To this end there are gripping devices which firmly grip the stems of the leaves, whether manually or automatically arranged for such gripping, and normally retain such grip until the process of stripping has been completed.  The

leaves so gripped by the stem are carried by the translating device, usually called a conveyer, between the peripheral surfaces of two rolls which come in contact with the leaves.

[1] It is to be gathered from the evidence and is not denied that none of the machines of the patents in suit have ever gone into actual use. The defendant contends that in view of this fact the patents in suit are to be treated as mere "paper patents" and as such disregarded. Whatever unfavorable inferences as to the validity of a patent may arise from the nonuser by the patentee of the invention covered by it, it is not now open to question that, if the patent be valid, it will continue in full force during the term for which it was granted although put to no practical use by the patentee or any one claiming through or under him. The essence of the patent monopoly is the power of exclusion. The grant of a patent does not confer the right to make, use or sell the patented invention except as coupled with the power of excluding others from so doing. An inventor would possess the right to make, use and sell without securing letters patent. Others, however, in the absence of unfair or wrongful competition, would have a right to do the same. But the owner of a valid patent has, not only his common law right to make, use and sell, but the statutory right to exclude all others from so doing. He is not obliged to exercise his common law right in order to avail himself of that conferred by statute. But when the validity of a patent is in question the continued non-user by the patentee of the invention without explanation satisfactorily accounting for it naturally suggests a question as to the effect of the patent.

[2] It is a general rule, possibly not without exceptions, that an infringer of a patent will not be heard to deny the utility of that which he has wrongfully appropriated for the purpose of benefiting himself. But the fact of infringement must be established. And where machines as called for by a patent have never been put in practical use there is often present an element of serious difficulty in determining with accuracy the mode and efficiency of their operation, and consequently whether the patent has been infringed.

In the descriptive portion of patent 630,344 in suit Guerrant says:

"My invention relates to a machine to which leaf-tobacco may be delivered and which will tear off and separate the blades of the leaves from their stems. The objects of my invention are to provide a feeder or carrier to which the tobacco may be conveniently and rapidly delivered by hand and which will present the leaves in series or groups in an orderly condition to a conveyer, to provide a conveyer which will effectively and surely take the leaves in groups or series as they are presented by the feeder or carrier and pass them through a stripper, to provide a stripper which will quickly and thoroughly remove the blades from the stems, and to provide a discharger which will separate the fully-stemmed blades from those partly stemmed and deliver them at different points."

In the machine as described a reel rotating on a horizontal shaft constitutes the conveyer; the reel having located upon its periphery grips which extend transversely to the line of feed and pass "in such relation to the feeder or carrier as to close upon a series of stems coextensive with the length of the grip" and withdraw them from the holders in the belt or band of the carrier and pass them "in a group

for simultaneous treatment by the strippers." The stripping rolls are so adjusted with respect to each other that when the gripping bars pass between them the upper and lower rolls separate sufficiently to allow the passage of the bars, the two rolls respectively moving upward and downward an equal distance, thus permitting the bars to pass the rolls without vertical change. This is the most prominent and distinctive feature of the Guerrant machine. The reel is so large in diameter that the gripping bars after passing through the rolls proceed in a rectilinear line, laterally considered, and approximately in a rectilinear line, vertically considered, for a distance representing the whole or a considerable proportion of the length of the average tobacco leaf. It does not clearly appear from the drawings what the diameter of the reel was; but it does appear that it was sufficiently large to insure the movement of the gripping bars in approximately a rectilinear line as above stated, such approximation becoming closer with an increase in the diameter. The claims relied on in this patent are Nos. 14 and 15, as follows:

"14. A tobacco-stemming machine comprising a stripper, consisting of a pair of cooperating brushes, a conveyer for presenting tobacco-leaves to the stripper, a grip mounted on the conveyer for holding the leaves, mountings for the brushes which permit them to move apart, and means for separating the brushes to permit the passage of the grips between them and closing said brushes upon the leaves behind said grips to perform said stripping function; substantially as described.

"15. A tobacco-stemming machine comprising a conveyer having a grip for holding the stems of the tobacco-leaves and a stripper to which the leaves are presented by said grips and which consists of a pair of cooperating brushes between which the grips pass, hangers in which said brushes are mounted, and shafts about which the hangers are swung to separate the brushes for the passage of the grips and bring them together upon the leaves behind the grips; substantially as described."

Whatever may be its validity I have failed to find any anticipation of the Guerrant patent. In fact the defendant's expert admitted that he had not presented "any single patent which shows the entire combination covered in the Guerrant claims in suit."

The broadest patent in suit on its face is that of Guerrant, and yet it is a narrow one. It marked but a slight advance over the machine of the Cochrane patent 538,660, of May 7, 1895. In that machine the pair of stripping rolls were separated to allow the gripping bars to travel through, the lower roll remaining stationary and the upper being raised the necessary distance automatically. The line of travel of the tobacco leaves was rectilinear and in a horizontal plane tangential to the peripheries of the stripping rolls when coacting upon the blades of the leaves, except when the gripping bars were sufficiently raised to clear the periphery of the lower roll. This movement of the bars deflected the line of travel of the leaves in a vertical plane to the extent rendered necessary by the passage of the bars between the lower stationary roll and the raised roll. Immediately after the bars cleared the rolls the bars descended to and resumed travel in the normal rectilinear line in the horizontal plane. By reason of the fact that the two stripping rolls did not mutually and equally separate from each other to allow the passage of the gripping bars the rolls did not as promptly begin the stripping of the leaves as

would have been the case had the leaves pursued a rectilinear course between the rolls in the horizontal plane. Under the operation of the Cochrane machine there was loss, and but slight loss, in the proportion of the leaf remaining unstripped and there was whatever danger of breakage of the leaf might be involved in its deflection from a strictly rectilinear course. The evidence bearing upon this subject does not show that the mutual and equal separation of the stripping rolls so as to avoid a departure from a strictly rectilinear movement of the leaves was a matter of much importance, although probably of some merit. Guerrant was the first to suggest such mutual and equal separation of the stripping rolls in the tobacco stemming industry. But he failed to provide for the movement of the gripping device in a rectilinear course in a horizontal plane. As before stated, the gripping bars followed the arc of a circle; that arc, for the length of the tobacco leaf, approximating to a rectilinear course. It does not appear that this slight variation from such a course would be calculated to break or otherwise damage the leaves. The machine was in no sense a primary invention, but merely an improvement, if valid, upon the Cochrane machine.

In the Guerrant machine as called for by the patent the stripping rolls consist of a pair of cylindrical brushes rotating upon journals supported in upper and lower hangers which swing around the shafts supporting them, imparting simultaneous and equal rotary movement to the brushes whereby they will slowly and continuously swing about the above mentioned shafts on which the hangers are mounted to permit the passage between the brushes of the gripping bars and coming together upon the leaves immediately behind such bars at the periphery of the reel at the point where the stripping is to take place. Guerrant states that the movements of the mechanism are so timed that the brushes come together immediately after the passing of the gripping device so that, while not interfering with the passage through of that device they will "close upon the leaves and effect the stripping as soon as the grips have passed through, and their travel about their shafts is slow enough to permit them to remain ample time together to effect stripping." There is, however, no spring tension or tension of any other nature causing the brushes to approach each other or be pressed together during the stripping operation or at any other time. The brushes are brought together only through their orbital movement controlled by the hangers, swinging around shafts on which the latter are mounted. I fail to perceive how it could have been possible after the gripping bars had passed between the brushes for the latter to remain in contact or so nearly in contact with each other as to avoid leaving unstripped a very considerable proportion of the respective leaves passing through the machine. The defendant's expert on this point well says:

"The fundamental defect in this Guerrant operation * * * is that these stripping rollers are constantly performong their orbital movement. They are together in a position where they can act upon the leaf only momentarily. They begin to separate immediately afterward and long before the grippers on the rotating carrier can draw the whole length of the leaf through between the stripping rollers the stripping rollers have got entirely out of the way."

[3, 4] It is well settled that it does not necessarily follow from the fact that an alleged infringing device comes literally within the terms of a patent claim that there is infringement. A claim must be read in the light of the disclosure of the invention as contained in the descriptive portion of the patent; for it is in that portion that the inventor is required to clearly set forth his invention or discovery. Having recourse, then, to the description in Guerrant's patent, I am unable to find infringement by the defendant. The mechanical devices in the Guerrant machine as described and in that of the defendant widely differ not only in form but in the principle of their operation; the construction and arrangement of the defendant's machine securing results impossible of attainment by the machine of the Guerrant patent. The mode of operation of the defendant's machine so far as the separation of the stripping rolls is concerned is entirely different. In the defendant's machine there are no hangers imparting an orbital motion to the stripping rolls. These hangers are a necessary and essential part of the mechanism of the Guerrant machine. Walker in his work on Patents (section 376), says:

"The superiority or inferiority of a defendant's process, machine, manufacture or process of matter, as compared with that covered by a patent upon which he is sued, can generally be traced to its cause. When that can be done, attention should be taken from the difference in utility, to the cause of that difference. Non-infringement will result if that cause is such a difference in function, mode of operation, or character of construction, as is of itself sufficient to justify that conclusion."

It is unnecessary to discuss other differences between the defendant's machine and that described in the Guerrant patent involving adjustments regulating the relative speed of the peripheral surface of the stripping rolls and of the conveyer, and other differential features.

In the description of the Hutcheson patent 713,886 in suit it is stated:

"The invention relates to a machine for stripping the leaf portion of a tobacco-leaf from the stem. The invention consists in the combination, broadly, in such a machine, of a leaf-stripping device, a leaf-clamping device, and means for moving said clamping device away from said stripping device during the operation of said stripping device upon the leaf; also, in means for moving said clamping device toward and then from said stripping device; also, in means for moving said clamping device while retaining the leaf between the stripping-rolls; also, in means for simultaneously cutting the leaf from the stem during its movement of translation while clamped as aforesaid; also, in the construction whereby the leaves may be guided in parallel columns to the stripping device; also, in the construction whereby the movement of said leaves to said stripping device is intermittently arrested."

The machine contains a controlling mechanism to arrest intermittently the movement of the leaves to the gripping bars. These bars are so adjusted as to grip and hold the leaves fed to them from channels in the feed table through the gate between such feed table and the bars, and to carry the leaves between the stripping rolls, which automatically and equally move in opposite directions to permit the passage of the bars. After the stripping of the leaf from its stem the latter is released by the separation of the bars. The leaves, whether fed by feed rollers or by hand, are delivered to the gripping bars in parallel

columns corresponding in number to the channels in the feed table, and the movement forward of the columns of leaves continues or is checked as the gate is intermittently opened or closed. The "several columns of leaves are all simultaneously grasped between the clamping-bars, which now begin to travel in a rectilinear path from front to rear of the machine." The patentee does not restrict himself to mechanism showing a series of guide channels for the leaves; for he says he may employ a table "without the channels, in which case, of course, the leaves will not be guided in parallel columns, as described." Each of the two stripping rolls is provided with "a plurality of circumferential grooves" and "with transverse cutting edges in each groove." The stripping rolls are so rotated that their teeth move while acting on the leaves in a direction opposite to that of the movement of the gripping bars, and the relative speed of the bars and the peripheries of the stripping rolls is so adjusted, according to Hutcheson's statement, as to cause no unnecessary tension in the leaves whereby the stems might be broken or other damage result. After the leaf has been stripped from the stem the gripping bars carry it to the rear of the machine where the bars separate and the stem is released. Both stripping rolls are positively rotated. The claims relied on in this patent are Nos. 1, 2, 3, 4, 5, 7, 8, 10, 13, 16, 17 and 18, as follows:

"1. In a tobacco-stripping machine, a leaf-clamping device, means for imparting to said clamping device a movement of translation, means for simultaneously cutting the leaf portion from the stem and gearing substantially as set forth whereby the speed of onward movement of the stem is made substantially equal to the speed at which said cutting means removes said leaf portion from the stem.

"2. In a tobacco-stripping machine, a leaf-clamping device, means for imparting to said clamping device a rectilinear movement of translation, a pair of rotary coacting rolls having circumferential grooves and transverse cutting edges therein and gearing substantially as set forth whereby the tobacco-leaf entering between said rolls has its leaf portion removed from the stem during said rectilinear movement of said clamping device and at a speed substantially equal to that of said movement.

"3. In a tobacco-stripping machine, a pair of coacting leaf-stripping rolls and a pair of coacting drawing-in bars; the said bars moving in a rectilinear path, and means for moving both of said rolls asunder in relatively opposite directions to permit the passage of said bars between them, substantially as described.

"4. In a tobacco-stripping machine, a pair of coacting leaf-stripping rolls, means for intermittently moving both of said rolls asunder in relatively opposite directions, and a pair of coacting drawing-in bars moving in a rectilinear path; the aforesaid parts being constructed and arranged so that a leaf on being grasped between said drawing-in bars is thereby carried between said stripping-rolls to be subjected to the action thereof, and the stem transported away from said rolls, substantially as described.

"5. In a tobacco-stripping machine, a pair of coacting stripping-rolls and means for intermittently moving both of said rolls asunder in relatively opposite directions, a leaf-clamping device, means for transporting said clamping device between said rolls during their separation and for imparting to said clamping device a further movement of translation during the action of said rolls upon said leaf, and gearing substantially as set forth; whereby the speed of said movement of translation is made substantially equal to the speed at which said stripping-rolls remove the leaf portion from the stem."

"7. In a tobacco-stripping machine, a leaf-clamping device, means for intermittently arresting the movement of the leaf to said clamping device, a leaf-

stripping device, and means for moving said clamping device to said stripping device, substantially as described.

"8. In a tobacco-stripping machine, a pair of coacting leaf-stripping rolls, means for intermittently separating said rolls, a pair of coacting drawing-in bars moving in a rectilinear path and passing between said rolls when said rolls are separated, and a controlling device governed by said bars for intermittently arresting the movement of the leaves in position to be grasped by said bars, substantially as described."

"10. In a tobacco-stripping machine, a pair of coacting stripping-rolls, yielding bearings for said rolls, leaf-clamping bars, means for transporting said clamping-bars between said rolls and associated with each of said clamping-bars, a cam constructed to force said rolls asunder in opposite directions during the passage of said clamping-bars between them, substantially as described."

"13. In a tobacco-stripping machine, a device timed and constructed intermittently to arrest the delivery of leaves to a clamping device, a clamping device timed and constructed to grasp said leaves at their advancing ends, a leaf-stripping device and means for conveying said clamping device to said stripping device, substantially as described."

"16. In a tobacco-stripping machine, a pair of coacting stripping-rolls, elastic bearings for each of said rolls, endless belts surrounding said rolls respectively and having their contiguous portions parallel and extending in front and in rear of said rolls, means for causing travel of said belts, a pair of coacting drawing-in bars respectively carried by said belts and a cam connected to each of said drawing-in bars and constructed to force asunder said rolls on passing between them, substantially as described.

"17. In a tobacco-stripping machine, means for intermittently arresting the delivery of leaves into the machine, a leaf-clamping device controlling said means and receiving said leaves, a stripping device, and means for moving said clamping device to convey the leaves to said stripping device, substantially as described.

"18. In a tobacco-stripping machine, a pair of coacting stripping-rolls, endless belts surrounding said rolls respectively, means for causing travel of said belts, a pair of coacting drawing-in bars respectively carried by said belts, and guides for maintaining the contiguous parallel portions of said belts in definite relative position, substantially as described."

The machine described in the Hutcheson patent combined the two distinctive features, respectively, of the Guerrant and Cochrane machines, in that it separates the stripping rolls equally and in opposite directions for the passage between them of the gripping bars, as in the Guerrant machine, and secures the travel of the bars in a rectilinear course, as provided for in the Cochrane machine. The Hutcheson patent represents mere improvements upon the machines of the prior art. It is narrower than that of Guerrant, and the claims contained in it are not, I think, entitled to much liberality of construction. Whatever merit may be found in certain improved features of the Hutcheson machine, the plaintiff is not entitled to claim for the patent the merit resulting from the combination of the rectilinear course of the gripper bars disclosed by Cochrane, and the separation equally and in opposite directions of the stripping rolls disclosed by Guerrant. Further, the plaintiff as owner of the Guerrant patent sues for its infringement. In the defendant's machine the gripping bars pursue a strictly rectilinear course, and not a curve representing the arc of a circle. The fact that the plaintiff sues for infringement of the Guerrant patent involves the assertion that the movement of the gripping bars in the Guerrant machine so clearly approximated to a rectilinear course as not to be distinguishable from it in the sense of the patent law.

If the plaintiff be right in the position it assumes with respect to the Guerrant machine, it is certainly wrong in contending for any broad or liberal interpretation of the claims of the Hutcheson patent. For on the above assumption the Guerrant machine discloses not only stripping rolls separating equally and in opposite directions for the passage of the gripping bars, but their movement substantially in a rectilinear course in a horizontal plane. These are two of the prominent features of the defendant's machine. Under these circumstances, if the claims of the Hutcheson patent can be supported at all their vitality depends solely upon and they must be restricted to mere improvements and minor features not involved in the foregoing considerations. An alleged infringing machine may perform the same function and accomplish the same result as one that is patented without infringement. To hold to the contrary would be to declare in opposition to settled principles the patentability of a mere function. If the mechanical means by which the function is performed be substantially different there is no infringement, and what should be viewed as an unimportant difference in the means employed as between primary or broad mechanical inventions becomes of the highest importance with respect to narrow inventions covering only mere improvements of a machine in some of its features. Bearing in mind the foregoing considerations, attention must be given to some of the points of difference between the defendant's machine and that of Hutcheson. Each of the Hutcheson claims in suit includes as an element of the patented combination the stripping rolls as described in that patent. These rolls are referred to in varying phraseology, being called indifferently "means for simultaneously cutting the leaf portion from the stem," "rotary coacting rolls having circumferential grooves and transverse cutting edges therein," "coacting leaf-stripping rolls," "a leaf-stripping device," "coacting stripping-rolls," and "a stripping device." Notwithstanding the variation in the phrases employed they all refer to the stripping rolls as set forth in the descriptive portion of the patent. In the Hutcheson machine each of the stripping rolls is provided with a "plurality of circumferential grooves" and "with transverse cutting edges in each groove"; and when the stripping rolls come together "each column of leaves now lies in its own pair of grooves and between the rolls, and the stripping action of the latter at once begins." In the defendant's machine the stripping rolls have narrow strips of card clothing wound spirally about the core or shaft, the object of which is twofold—First, convenience in the manufacture of the rolls, and, secondly, the bringing of the teeth "in an indiscriminate way on the roll," to the end that as the tobacco leaf is pulled between the rolls it may be brought more thoroughly into contact with the wire teeth. This difference with respect to the rolls does not constitute a mere improvement upon the Hutcheson stripping rolls, but involves a difference in the principle of operation of the machines; the leaves in the Hutcheson machine normally being severed by the transverse cutting edges from the stem while in the circumferential grooves, while in the defendant's machine the membranous portion of the leaves is separated from the stems, not so much by cutting, as by tearing or abrasion by the card clothing on

the rolls. Further, the defendant's machine is so constructed that normally the speed of the gripping bars is high as compared with the peripheral speed of the stripping rolls, while in the machine of the Hutcheson patent such is not the case. Hutcheson says:

"The stripping-rolls are rotated, so that the teeth therein move while acting on the leaves in a direction opposite that of the movement of the clamping-bars which grasp the butts. The relative speed of movement of bars and rolls is to be such as that the stem will be carried onward at a rate corresponding to that of the cutting away of its leaf portion by the action of the cutting-teeth. In other words, there should be the minimum of draft, or substantially no draft, on the stem, tending by tension to break it or tending forcibly to drag stem and leaf through the opening formed by the meeting of the pair of grooves, and so to tear leaf and stem apart."

It appears from the evidence that in the defendant's machine there is a slow backward rotation of the stripping rolls, their peripheral speed amounting to only about one-tenth of the speed of the gripping bars, while in the Hutcheson machine the peripheral speed of the stripping rolls is twice or thrice as great as the speed of the gripping bars, and consequently the ratio of the peripheral speed of the stripping rolls to the speed of the gripping bars is from twenty to thirty times as great as the corresponding ratio in the defendant's machine. If due allowance be made for errors in calculation caused by inaccuracies in the scale proportions of patent drawings there still can be no question that the peripheral speed of the stripping rolls in the defendant's machine as compared with the speed of the gripping bars is many times less than that in the Hutcheson machine, and constitutes a departure from the former art. This difference in speed coupled with the difference in construction and arrangement of the stripping rolls already mentioned accounts for and explains the distinction in the principle of operation of the rolls upon the leaves between the Hutcheson machine and the defendant's machine respectively; in the former the leaves being stemmed through the cutting action of the transverse teeth, and in the latter through tearing or abrasion resulting from the drawing of the leaf with considerable speed over the card clothing surface of the rolls. As the stripping rolls are included as an element in each and all of the claims in suit, and in the defendant's machine are not the same either in construction or operation as those described in the Hutcheson patent, the defendant has not used any combination mentioned in those claims, and therefore has not infringed that patent.

The Underwood patent 661,199 in suit purports to cover improvements upon the mechanism contained in the tobacco stemming machines disclosed in certain earlier patents issued to him. So far as pertinent to this case it relates to the feeding mechanism. Underwood in the patent description states that among the objects of the invention were the improvement of "the means employed for controlling the feeding of leaves to the stripping mechanism," and the prevention of "leaves from becoming tangled in the stripping mechanism or from wrapping about the stripping or feeding rolls." The claims relied on are Nos. 1 and 2, as follows:

"1. In a leaf-stemming machine, the combination, with stripping mechanism which intermittently receives leaves and then strips the same, and means for

feeding leaves thereto, of means for moving away from such stripping mechanism, at times when stripping is going on, leaves which have been presented to such stripping mechanism but have not been engaged thereby.

"2. In a leaf-stemming machine, the combination, with stripping mechanism, which intermittently receives leaves and then strips the same, and means for feeding leaves thereto, of a movable member located in front of such stripping mechanism, and means for moving said member across the plane of movement of the said leaves, to deflect from their normal path and hold away from the stripping mechanism leaves which have been presented thereto but not engaged thereby."

Claim 1 covers means for moving from the stripping mechanism while stripping is going on leaves which have been presented to but not engaged by such mechanism; and claim 2 covers a movable member located in front of the stripping mechanism and means for moving the member across the plane of movement of the leaves to deflect from their normal path and hold away from the stripping mechanism leaves which have been presented to but not engaged thereby. The "means" and the "movable member" are not described in the claims and, therefore, recourse must be had to the descriptive portion of the patent to ascertain their construction and mode of operation. The description states that "the combined leaf-stop, leaf-rest, and leaf-bridge mechanism" of the invention comprises a single member consisting of side arms pivotally hung on the front edges of the main frame of the machine, and a transverse bar of triangular shape, of which one of its sides faces the front of the discharge end of the feeding table; that the triangular transverse bar is so hung to the main frame as to drop to its lower position by gravity, and the angle of the upper edge of the bar is such that when the bar is at its lowest position the upper edge of the bar is substantially horizontal and forms a bridge-piece between the discharge end of the feed table and two initial feed rolls, of which the upper one is mounted in a cradle, and the lower on swinging arms fulcrumed on a transverse shaft and provided with pendent members pivotally connected to cranks, mounted on a transverse bar or shaft, one of the cranks having fixedly connected with it a second crank arm, which forms the shifting lever; that during the stripping rotation of the stripping rolls the shifting lever remains motionless and the triangular transverse bar rests with its front edge above the table bed and forms a combined leaf-stop and leaf-rest as it projects in the path of the leaf upon one of the feed belts of the table, and prevents the leaf from feeding forward during the stemming of the preceding leaf, also "deflecting and forming a rest for such precedingly-fed leaves as may not have properly engaged the stripper-rolls"; that at intervals the direction of rotation of the stripping rolls, which normally is opposite to that of the leaf through the machine, is reversed, so that the stripping rolls may act temporarily as feed rolls, and at the time when such reversal of direction of rotation occurs certain described mechanism moves the initial feed rolls into a position causing the triangular transverse bar to fall to such an extent that its upper face is in the plane of the surface of the feed table; that the leaves upon the feed table are then carried forward by feed belts over the bridge formed by the upper face of the triangular transverse bar and are caught and carried for-

ward by the initial feed rolls to a point where they are caught by the stripping rolls, at the moment acting as feed rolls, such rolls carrying the leaves on until their stems are firmly grasped by drawing rolls beyond, when the direction of rotation of the stripping rolls is reversed by certain described mechanism, resulting in moving the initial rolls into their normal position and raising the triangular transverse bar so that its upper edge projects above the plane of the surface of the feed table, and renders impossible the passage of leaves forward from the feed table until the transverse triangular bar again descends, thus preventing the machine from becoming clogged and the leaves from becoming tangled and torn or imperfectly stripped. Claim 1 covers a mechanical combination including among its elements "means for feeding leaves" to the stripping mechanism. The patent is a machine patent and the feeding means must consist of mechanism and not the action of the human hand. The defendant's machine does not disclose mechanism for feeding the leaves to the gripping bars or stripping rolls. Whatever partial stripping of the butts of the leaves is practiced by the defendant is a preliminary operation intended mainly if not solely to facilitate the proper engagement of the leaves by the gripping bars, and is completed before the leaves are fed by the hand of the operative to the stripping mechanism. In the machine described in the Underwood patent the leaves are fed to the stripping rolls by mechanism forming strictly a part of the stemming machine. The defendant's machine, therefore, lacks one of the elements of claim 1. And the same is equally true as to claim 2. Further, claim 1 includes as one of the elements of the combination "means for moving away from such stripping mechanism, at times when stripping is going on, leaves which have been presented to such stripping mechanism but have not been engaged thereby." In order to ascertain the nature and operation of such means it is necessary to refer to the description, and the description discloses that the means provided in the Underwood machine are substantially different, not only in form, but in function from anything contained in the defendant's machine. The mechanism constituting such means in the Underwood machine is located between the forward end of the feed table and the feed rolls, and operates intermittently to prevent the passage of any leaves, whole or fragmentary, perfect or imperfect, from the feed table to the rolls until such time as the immediately preceding leaves have gone through the stripping operation. The mechanism does not throw out of the machine leaves or any portion of leaves. On the contrary they are merely arrested until such time as by the falling of the triangular transverse bar the "leaf-bridge" is in position to permit them to pass automatically to the rolls. Further, while the description states that "a leaf which is not engaged by the stripping-rolls when the stop *8b* first falls will usually enter between said rolls properly time the second time the stop falls," it is evident from an inspection of the patent description and drawings that a leaf cannot become engaged by the stripping rolls until after it has passed over the leaf-bridge, and therefore the suggestion in the claim of means of moving away from the stripping mechanism "leaves which have been presented to such stripping mechanism but have not been engaged

thereby" is wholly foreign to anything appearing in the description. Similar considerations apply in full force to claim 2. In the defendant's machine the mechanism which is complained of as infringing claims 1 and 2 consists of a roller having peripheral projections located below the line of travel of the leaves and between the point at which the gripping bars first engage them and the stripping rolls. This roller is rotated in such manner as to cause its upper portion to move opposite to that of the movement of the leaves as they are drawn to the stripping rolls, and to engage the hanging portions of broken leaves and with its rotating speed, to strike against and completely detach and throw the same out of the machine. In no respect does it resemble in form, principle of operation or function any element contained in claims 1 and 2 of the Underwood patent.

The Havens patent 764,845 is for certain alleged improvements upon the tobacco stemming machine of the Hutcheson patent in suit. In the patent description he says:

"The said improvements consist in the novel construction and arrangement of the feed-table, the gate, and clamping-bars associated therewith and also of the rotary receiving-table and mode of operating the same; also, in the construction and arrangement of the brushing and delivering devices; also, in the various combinations more particularly hereinafter pointed out."

The claims relied on are Nos. 1, 2, 3, 4 and 6, as follows:

"1. In a tobacco-stripping machine, a feed-table, a movable gate and a leaf-carrier constructed and arranged to engage the leaves in front of said gate.

"2. In a tobacco-stripping machine, a feed-table, a movable gate, a leaf-carrier constructed and arranged to engage said leaves in front of said gate and means for opening said gate to permit outward travel of said carrier.

"3. In a tobacco-stripping machine, a feed-table, a movable gate and a leaf-carrier constructed to engage said leaves in front of said gate and means for moving said carrier to open said gate.

"4. In a tobacco-stripping machine, a feed-table, a movable gate, a clamping device for the leaves and means for imparting to said device a movement of translation; the said clamping device being constructed and arranged first to grasp the leaves and second to open said gate."

"6. In a tobacco-stripping machine, a feed-table, a movable gate, a pair of coacting clamping-bars and means for bringing said bars together to clamp the leaves and for imparting to said bars a movement of translation; the aforesaid parts being constructed and arranged so that, first, the upper bar descends upon the leaves at the delivery end of the table; second, the bars meet to grasp the leaves; third, the bars moving onward open the gate to permit their own passage."

The machine described in this patent discloses a feed gate supported on pivots from a vertical support. Havens states that the purpose of the gate is "to prevent the leaves from passing into the machine in advance of the clamping-bars and also after the clamping-bars have carried the leaves beneath said gate to draw out and flatten said leaves, and so prepare them for the action of the stripping-rolls." The tobacco leaves are placed butts foremost on the feed table and are fed forward by hand to the feed end, and just as the leaves reach the delivery end of the table the upper of the clamping bars meets them and carries them along and an instant later the leaves become gripped between the elastic faces of the bars. The upper bar in moving strikes the gate, lifts it and passes under it, and the gate then swings

back to its original position. The gripping bars holding the leaves continue forward and pass between the shafts of the stripping rolls forcing them asunder against the action of helical or spiral springs. The claims relied on conform, I think, to the description. The principal question is whether the defendant has infringed. In claims 1, 2 and 3 an engagement of the leaves in front of the gate is required, and it is equally required in claims 4 and 6; claim 4 requiring a clamping device "constructed and arranged first to grasp the leaves and second to open said gate," and claim 6 requiring that the mechanism of the machine be "constructed and arranged so that, first, the upper bar descends upon the leaves at the delivery end of the table; second, the bars meet to grasp the leaves; third, the bars moving onward open the gate to permit their own passage." This requirement strictly accords with the mechanism of the machine as disclosed in the description on a proper construction of the patent as a whole. An engagement of the leaves may occur either while the gate is at rest or after it has begun to move and before the gripping device passes under it. In the one case the leaves are engaged before the gate at rest, and in the other before the gate in motion, but in either case in front of the gate. An inspection of the patent drawings alone would strongly indicate, on the assumption of their correctness, that the leaves could not be actually engaged in the sense in which that term is employed in the patent until the upper of the two gripping bars strikes the gate and causes it to a certain extent to swing toward the stripping rolls. But the leaves must be engaged before they pass through or under the gate. The description and patent drawings harmonizing with an interpretation recognizing an engagement of the leaves in front of the gate after it has begun to move and the claims expressly requiring an engagement of the leaves in front of the gate, I entertain no doubt that in the machine of the Havens patent the gripping device engages the leaves in front of the gate, although moving, and before such device gets behind the gate by passing under it. In the defendant's machine there is no such mechanism. The plaintiff contends that the swinging flap of the defendant's machine and the vertical surface of the fixed abutment or end of the stationary plate or gage, taken in conjunction with each other, constitute the full equivalent of a gate. The upper surface of the stationary plate or gage is sufficiently below the rectilinear line of feed to permit the gripping bars to pass between the stripping rolls without deflection from that line, and if the stems of the leaves were raised only to or barely above the level of the upper surface of the stationary plate or gage it is evident they would not be in the rectilinear line of feed travel, and that to reach that line it would be necessary to raise them considerably above such level, and that the object in so raising the leaves would be not barely to clear the upper edge of the stationary plate or gage but to place them where without deflection they could pass in a rectilinear line through the machine. Under these circumstances, and on the assumption that the normal function of a gate is to shut rather than to open, the vertical surface of the fixed abutment is not interposed in the line of feed travel and in no legitimate sense

shuts off the leaves from pursuing that line. On the contrary, as soon as the gripping bars engage the leaves they proceed in a rectilinear line above and beyond the vertical surface of the fixed abutment without any functional action whatever on the part of that abutment. In the Havens machine the movable gate extends downward to the rectilinear line of feed and until pushed forward by the upper gripper bar prevents the passage of the leaves in their normal line of travel. No mechanism of the kind is disclosed in the defendant's machine. Even if the claims of the Havens patent were entitled to a broad, in contradistinction to a narrow, construction it would be a matter of grave doubt whether there is in the defendant's machine the mechanical equivalent of the Havens movable gate. But in view of the narrow character of the Havens invention and of the prior art as disclosed in the Underwood and Hutcheson patents in suit, as well as others, I consider the contention of the plaintiff inadmissible, even on the assumption that the normal function of a gate is to shut rather than to open. If there be no movable gate in the defendant's machine there is no infringement of the Havens patent. But if the defendant's machine discloses a movable gate it consists of the swinging flap. Before this flap is raised toward the horizontal line of travel the stems of the leaves project beyond its outer edge, and when they are gripped it is either at a point beyond, and therefore behind, in the sense of the Havens patent, such edge, or after the swinging flap has fallen, in which latter case in no legitimate sense could it be said that the stems were engaged at a point in front of the gate. It would display a distortion of ideas as well as of language to claim that leaves are engaged before a movable gate when there is not at the time of engagement or at any time thereafter any gate for the engaged leaves to pass. Whatever effect the raising of the swinging flap may have in preserving an alignment of the leaves in such manner as to obviate possible sagging or other disarrangement, it is the gripping bars which raise the leaves to the proper level and launch them on their rectilinear course, the swinging flap falling before they reach that course, and before their engagement.

The Frankenburg patent, 715,651, relates to the stripping device in tobacco stemming machines. In the patent description it is said:

"My invention relates to tobacco-stripping machines, and has for its object improvements in machines for that purpose. In machines of the class to which the present invention relates the stem of the tobacco-leaf is inserted between knives which open and close, and after the knives are closed the stem is seized by fingers and drawn through the knives, leaving the leaf on one side of the knives and discharging the stem on the other."

The only claim relied on in this patent is the third, as follows:

"3. The combination with a pair of blades for stripping tobacco-leaves, of devices for automatically opening and closing said blades, and means for controlling the movement of said blades whereby the closing action is uniform toward a fixed center."

The patent does not call for rotating stripping rolls, but for a pair of blades which close upon the leaves, the latter being pulled between the edges of the knives in order to be stripped. It is not necessary

to consider the novelty, utility or patentability of the subject-matter of the claim, as in no aspect of the case, I think, has the defendant infringed it. ·

I have reached the conclusion that for the reasons hereinbefore given the defendant has not infringed any of the patents in suit, and that the bill must be dismissed, with costs.